Filed 1/27/16  Guardianship of Brooke M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| Guardianship of BROOKE M., a Minor. | D066547 |
| STACIE M., | (San Diego County |
| Petitioner and Appellant, | Super. Ct. No. |
| v. | 37-2013-00035488-PR-GP-CTL) |
| SHANNON P., | |
| Objector and Respondent. | |


APPEAL from an order of the Superior Court of San Diego County, Robert C. Longstreth, Judge.  Affirmed.

Stephen Temko for Petitioner and Appellant.

Griffith & Thornburgh and John R. Rydell, II, Marisa K. Beuoy for Objector and Respondent.

Stacie M., who is Brooke M.'s paternal grandmother, appeals a court order denying her Family Code section 3041[1] petition for guardianship of Brooke, and instead granting custody to Brooke's mother, Shannon P. Stacie contends: (1) the court prejudicially excluded from evidence two arrest reports involving Robert, who is Shannon's current husband, and a handwriting expert's testimony; and (2) there was cumulative error. Shannon requests we sanction Stacie for filing a frivolous appeal. We will deny Shannon's cursory request, and affirm the trial court's order.

FACTUAL AND PROCEDURAL BACKGROUND

Stacie did not challenge the statement of decision in the trial court, nor does she challenge any specific factual finding on appeal. We therefore rely primarily on the detailed November 2014 statement of decision.[2]

Brooke was born in July, 2008. In 2011, following divorce proceedings, the Santa Barbara County Superior Court granted Brooke's parents joint legal custody of her. In July 2012, Brooke's parents agreed Brooke would live with her father in San Diego

---

1  All statutory references are to the Family Code unless otherwise stated.

2  In her request for a statement of decision, Stacie raised the following questions: "1. Did [Stacie] serve as Brooke's de facto parent by meeting her psychological needs for care and affection on a day to day basis for a substantial period of time (Probate Code [*sic*] section 3041(c))? [¶] 2. Did [Shannon] meet Brooke's psychological needs for care and affection on a day to day basis after July 1, 2012 for a substantial period of time? (Probate Code [*sic*] section 3041(c)) . . . [¶] . . . [¶] 3. Is there detriment to Brooke by an abrupt change in her current placement? [¶] 4. Is Brooke's best interest served by an abrupt change in her current placement? [¶] 5. Is there detriment to Brooke residing in [Robert's] household? [¶] 6. Is it in Brooke's best interest to reside in [Robert's] household?"

during the school year, and Shannon would visit with Brooke for one weekend every month.

Brooke's father died on February 15, 2013, and shortly afterwards Stacie filed a petition for temporary guardianship of Brooke. On February 26, 2013, Judge Bostwick of the San Diego County Superior Court granted Stacie's petition.

In May 2013, the Santa Barbara Superior Court granted Shannon's ex parte application for sole physical and legal custody of Brooke, and retained jurisdiction over child custody matters.

In June 2013, Judge Bostwick granted Shannon's motion to coordinate the Santa Barbara case with the pending guardianship petition.

In July 2013, over Stacie's objection, Judge Bostwick granted visitation between Brooke and Shannon, finding that "[n]o credible evidence was presented that there were any difficulties or problems with any of these visits, or that [Shannon] was unable to care for Brooke properly."

Following a seven-day bench trial held in May 2014, Judge Longstreth of the San Diego County Superior Court denied Stacie's petition for permanent guardianship of Brooke, finding that "[Stacie] admitted at trial that the Petition contains false statements." The judge further found that on February 19, 2013, Stacie had abducted Brooke in violation of Penal Code, section 278, and thus "isolated Brooke from [Shannon] . . . as well as from both of [Shannon's] parents, who had been the primary caretakers of Brooke for the first 18 months of her life, and with whom Brooke had a close relationship." Moreover, "[b]efore [Stacie] returned Brooke to Child Protective Services the following

3

day as directed by the police, she told Brooke, incorrectly, that Brooke would be spending the night in institutional care. Brooke's therapist . . . testified that the encounter with the police at Child Protective Services caused Brooke greater emotional distress than even the death of her father."

Judge Longstreth ruled that Stacie had not satisfied the first prong of section 3041, subdivision (a), requiring a finding that granting custody to a parent would be detrimental to the child: "[Shannon] was awarded joint legal custody and fifty percent physical custody by the Superior Court of Santa Barbara County in the spring of 2011, a decision that necessarily implies that she was fit to care for her child. No evidence was presented of any significant issues arising with respect to Brooke during the time [Shannon] cared for her. [Shannon] and [Robert] have cared for the two children from their relationship since the children's birth, and no evidence was presented that these children are not being properly cared for or that there has been any issue with respect to either parent's care. The Family Court Services Guardianship Investigation completed July 30, 2013, concluded that there were no existing safety issues in the mother's residence, and found that there was no corroborating evidence to support [Stacie's] concern that [Shannon's] history of substance abuse represents a current issue."

Judge Longstreth also found Stacie had not met the second prong of section 3041, subdivision (a), to show that granting custody to a nonparent is required to serve the best interest of the child: "Based on the evidence, the Court cannot find that [Stacie] has provided a stable home for Brooke that has fulfilled her psychological needs. Instead, the Court finds that the care of Brooke, particularly at the time of her father's death and for

4

many months thereafter, was extremely disruptive, and that Brooke suffered substantial emotional damage from that care." Judge Longstreth made the point: "[Stacie] added to the lack of stability for Brooke during this time by removing her from the preschool that she was attending for approximately thirty hours each week, choosing instead to have her tutored at home for only eight hours a week." The court stated: "[Stacie] has not proven, and certainly not by the required clear and convincing evidence, that terminating the guardianship would be otherwise detrimental to Brooke. The court credits [Stacie's] testimony . . . [that Brooke] has established a bond with [Stacie] and with her paternal grandfather . . . but there was no evidence that [Brooke] has any other close relatives or friends in San Diego now that her cousin has returned to New Jersey. At [Shannon's] home, [Brooke] would have a mother, a stepfather, two younger siblings, and aunts, uncles and cousins through her stepfather living nearby, as well as much greater access to her maternal grandparents and maternal aunts, uncles and cousins . . . . In addition, [Stacie] has a home relatively nearby in Reno. [Stacie] failed to establish that Brooke has any medical or educational needs that could not be met if the guardianship is terminated; in fact, the evidence established that [Stacie], understandably focused on the loss of her son, was slow to address these needs. Extending the guardianship would cause further harm to Brooke's relationship with [Shannon], half-siblings, maternal grandparents and other maternal relatives."

Judge Longstreth specifically addressed Stacie's claims regarding Shannon's drug use: "The statements that [Shannon] was currently struggling with IV drug addiction and that she was an IV drug abuser with an opioid dependency (Heroin) at the time the

5

petition was filed were . . . supported by thin, indirect evidence, and were contradicted by substantial contrary evidence, including direct testimony and the results of numerous drug tests over the past four years, one of which was taken at [Stacie's] insistence during a luncheon recess of the trial.  No evidence was offered that [Shannon] abused her prescription maintenance drugs by injecting them, and [Stacie] did not prove that [Shannon] was otherwise abusing those drugs."

Judge Longstreth concluded:  "[Stacie] did not meet Brooke's psychological needs for care and affection on a day to day basis after July 1, 2012 for a substantial period of time.  [¶]  There is no detriment to Brooke by immediately changing her custody to [Shannon].  [¶]  It is in Brooke's best interest to immediately return her to Shannon's custody.  [¶]  There is no detriment to Brooke by residing in [Robert's] household.  [¶]  It is in Brooke's best interest to reside in [Robert's] household."

DISCUSSION

I.

*The Court Did Not Abuse Its Discretion by Excluding the Arrest Reports*

Stacie contends that Robert's arrest reports (exhibit Nos. 155 and 185) were admissible as inconsistent testimony (Evid. Code, § 1235[3]) and under the public employee business record exception to the hearsay rule (Evid. Code, § 1280[4]).

---

[3]    Evidence Code section 1235, states:  "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770."

A. *Background*

At trial, after a Family Court Services counselor testified he had not taken into account Robert's criminal history in preparing his findings and recommendations regarding custody of Brooke, Stacie sought to admit into evidence a copy of a police arrest report from Robert's 2010 arrest for domestic violence (exhibit No. 155). The court sustained a hearsay objection, stating, "I don't consider introducing an arrest record, police reports, and so forth to be appropriate to prove the truth of things that are stated in there." The court also told Stacie's counsel: "[W]hen people are arrested, they are still presumed innocent, so I don't know . . . the extent to which you take that into account, but I—I'm worried about if the answer is going to be helpful to you one way or another, whether [the investigator] would have taken [the arrest record] into account or not taken it into account, so there is that issue as well." Stacie's counsel argued the arrest report was "a representation from [Robert] of what he told the police happened." The court replied: "No, it's not. It's at least double hearsay for that purpose."

Stacie's counsel later asked the investigator on direct examination: "If you were aware of a domestic violence arrest history in [Shannon's household], would that impact your determination that it might be detrimental for Brooke [] to live with her mother?"

---

4    Evidence Code section 1280, states: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies:  [¶]  (a) The writing was made by and within the scope of duty of a public employee.  [¶]  (b) The writing was made at or near the time of the act, condition, or event.  [¶]  (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

7

The investigator replied: "I'd have to look at other factors. Again, if I were to ask the question and that information was presented, I would want to see, you know, whether that was corroborated in the background checks, what the results of that arrest or—you know, basically what stemmed from that. [¶] So I guess an arrest in and of itself isn't generally enough to then put emphasis on that one specific item versus how does that impact what's happening right now."

During Robert's direct examination, the court again sustained a hearsay objection to exhibit No. 155, but permitted Stacie's counsel to ask Robert if he recalled the woman involved in the domestic violence incident. Robert responded that he did not recall her.

During Robert's testimony regarding his April 2012 arrest, involving his misuse of prescription medications and being caught with used syringes, Stacie's counsel sought to introduce into evidence a copy of Robert's April 2012 arrest report (exhibit No. 185). Judge Longstreth sustained a hearsay objection to it, adding: "It's also cumulative because it's what [Robert] said already." Nevertheless, Judge Longstreth permitted counsel to use that arrest report to impeach Robert. Thereafter, Stacie's counsel asked Robert whether he had told police certain information found in the arrest report, including that Shannon had given him the medications police had found in his possession. Robert denied telling the police that information, but testified he "believed" he had told police that the medications were from his mother's prescription. He later asserted: "They were all prescription medications that I had legal prescriptions for." Robert also testified that that arrest resulted in only a trespassing charge, to which he pleaded guilty, and the matter was adjudicated as a probation violation.

Afterwards, Judge Longstreth again sustained objections that the arrest record was hearsay, cumulative and lacked foundation.  At the end of trial, Judge Longstreth sustained objections to exhibit Nos. 155 and 185, concluding that Evidence Code section 1280's requirements were not met:  "There's no custodial affidavit or anything else, so that's a fundamental reason, and then there's—before we even get into the fact that there are many things in there that the officer said, so I don't see a reason to reconsider my ruling on that."  When Stacie's counsel asserted the arrest reports were certified copies, the judge replied:  " 'Certified copies' does not lay the foundation.  There are elements you have to meet.  Just because they are authentic doesn't mean you laid the foundation for the hearsay objection.  They are two different things."

B.  *Legal Principles*

Section 3041 governs contested guardianship appointment proceedings and provides that parents are first in the order of preference for a grant of custody, but a showing of de facto parent status by a nonparent creates a rebuttable presumption that it would be detrimental to place the child in the custody of a parent and the best interest of the child requires nonparental custody.  (§ 3041, subds. (a), (c), (d).)  The best interest of the child is the sole criterion governing guardianship termination proceedings.  (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 490 (*Guardianship of L.V.*) [ward's best interest is only criterion for determining whether to terminate a probate guardianship]; Prob. Code, § 1601.)  What constitutes the best interest of a child presents an inherently factual issue.  (*Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1159-1161 [whether parental custody is detrimental to minor or whether award of

9

custody to nonparent is required to serve child's best interests are factual questions].) The decision whether to terminate a guardianship is committed to the trial court's sound discretion. "It is an inquiry that is particularly founded on application of the trial court's experience with human conduct." (*Guardianship of L.V.,* at p. 488.)

Generally, unless otherwise permitted by law, hearsay is not admissible in guardianship proceedings. (Evid. Code, §§ 300, 1200; Prob. Code, § 1000; see also *In re Guardianship of Akers* (1920) 184 Cal. 514, 520.) " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) A trial court has broad discretion in determining whether a record is admissible under an exception to the hearsay rule. (*People v. Martinez* (2000) 22 Cal.4th 106, 120.)

It is well established that trial courts "must exercise their discretion to exclude under Evidence Code section 352 evidence that is unduly cumulative." (*People v. Brady* (2010) 50 Cal.4th 547, 583; *Douillard v. Woodd* (1942) 20 Cal.2d 665, 669 ["A trial judge is not bound to allow cumulative testimony upon the same point"].)

C. *Analysis*

We conclude Robert's arrest reports were cumulative of his testimony regarding his arrests. Robert testified he did not remember the circumstances surrounding the domestic violence arrest. He also explained that when he was arrested in April 2012, his syringes contained his prescription drugs, and he was only charged with misdemeanor loitering, not drug possession or any other drug-related crime. Therefore, the court did

not abuse its discretion by excluding evidence of the arrest reports, particularly because despite Stacie's protestation to the contrary, it appears the sole use she sought to make of that evidence was for the truth of the hearsay statements contained in them.

The arrest reports presumably went to the issue of Robert's drug use and his likelihood of inflicting domestic violence on Shannon. But the statement of decision points out: "The undisputed evidence showed that [Robert] has been employed full-time since January 2013." The court also stated that a benefit of Shannon having custody of Brooke was that Brooke would live with Robert and near his relatives. Finally, the court ruled: "[Shannon's] supplemental brief states that she and [Robert] will obtain a hair follicle test every three months . . . . The court has incorporated this proffer into its order. The court's conclusions have been based on its trust and expectations that [Shannon] will handle the transition of Brooke to her care sensitively and appropriately." We therefore conclude that because the court was aware of the contents of the arrest reports through Robert's testimony, the court did not perceive that Robert's past drug use endangered Brooke's best interest. This decision was reasonable and not an abuse of discretion.

We also point out that both the arrest reports and the expert's testimony are related to section 3041 subdivision (a)'s first prong regarding detriment to Brooke caused by granting custody to Shannon. Stacie would still have to overcome the hurdle of the statute's second prong, requiring a showing that granting her custody of Brooke was required to serve Brooke's best interest. The court specifically found that Stacie's care of Brooke, was "extremely disruptive, and that Brooke suffered substantial emotional

11

damage from that care," "particularly at the time of [Brooke's] father's death and for many months thereafter." Stacie does not challenge that finding.

## II.

### *The Court Did Not Abuse Its Discretion by Excluding the Expert's Testimony*

Stacie contends the trial court prejudicially erred by excluding the testimony of a handwriting expert who would have testified that Shannon had falsified certain drug test results.

### A. *Background*

During the trial's rebuttal phase, Stacie sought to call handwriting expert Jill Wilson to testify regarding her analysis of Shannon's handwriting. Shannon's counsel objected that despite the fact Stacie had included Wilson on her witness list, Wilson was not called to testify in Stacie's case-in-chief, thus denying Shannon an opportunity to call a rebuttal witness, Kim Stone, with 10-to-12 days' notice. Instead, by waiting until rebuttal to call Wilson, Stacie prejudiced the defense because Stone would have had only one day's notice to travel from South Tahoe to San Diego to testify.

Shannon's counsel also pointed out that Judge Bostwick had addressed allegations Shannon had falsified signatures. After reviewing Wilson's declaration that Shannon had signed certain drug test reports herself, Judge Bostwick suspended Shannon's unsupervised visitation with Brooke, and Shannon was required to take another drug test. Stone subsequently declared that as part of her employment at a drug lab, she had filled out the forms for Shannon's drug test results. Stone further declared Wilson had never contacted her, and no one had asked her to provide a handwriting sample. Shannon's

12

drug test was negative, and Judge Bostwick thereafter restored Shannon's visitation with Brooke.

Judge Longstreth stated that during the case-in-chief, Stacie's counsel had extensively covered the issue of Shannon's drug use, including Shannon's purported "falsification" of the drug reports. Specifically, Judge Longstreth had asked Shannon why Judge Bostwick had ordered that her visits with Brooke be supervised. Shannon replied: "I believe they had said the integrity of my drug tests were—they accused me of falsifying my drug tests and got a handwriting expert, which is absolutely not the truth. So the judge ordered me to have supervised visitations because of their accusations." Describing Stacie's request to admit Wilson's testimony during rebuttal as "sandbagging," "a bootstrapping argument," and "a collateral matter," Judge Longstreth denied it, reasoning that if Wilson's testimony "was that important, [Stacie's counsel would have raised it] earlier, and so if it really is that important and [Stacie] waited until [rebuttal], then the only possible conclusion is gamesmanship."

B. *Applicable Law*

The trial court is vested with discretion to determine the scope of rebuttal, and its ruling will not be disturbed absent a clear abuse of that authority. (*Diamond Springs Lime Co. v. American River Constructors* (1971) 16 Cal.App.3d 581, 604; *Ray v. Jackson* (1963) 219 Cal.App.2d 445, 454.) "It is well settled that a party who has the affirmative may not reserve a portion of his evidence until the opposite party has exhausted his to negative that offered in the first instance, and if he does so, the court may refuse to allow

13

him to come in and make out his case after the defendant rests." (*Lipman v. Ashburn* (1951) 106 Cal.App.2d 616, 620.)

C. *Analysis*

Stacie could have called Wilson to testify about the handwriting analysis in her case-in-chief, when Shannon's drug use was extensively explored. In fact, Shannon had testified that Judge Bostwick suspended her unsupervised visitations with Brooke following Stacie's allegation about the falsified drug test results. But Stacie elected not to call Wilson to testify at that time. The court acted well within its discretion in determining that the testimony Stacie sought to offer was not proper rebuttal evidence but an attempt to do what Stacie should have done in her case-in-chief. There was no error. Courts impose restrictions on rebuttal evidence in part "to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial." (*People v. Young* (2005) 34 Cal.4th 1149, 1199.) In denying the rebuttal testimony, the court protected Shannon from what it perceived as Stacie's gamesmanship.

In any event, Judge Longstreth addressed in part the merits of this matter in his statement of decision: "Visitation between Brooke and [Shannon] was finally ordered, over [Stacie's] objection, in early July 2013. The visits were initially ordered to be supervised, but this was modified to provide for unsupervised visits the following month. The supervision was reinstated in October 2013 because of Judge Bostwick's concerns over irregularities in one of [Shannon's] drug tests, but the supervision requirement was again lifted in December 2013 after [Shannon] submitted tests that addressed Judge Bostwick's concerns. No credible evidence was presented that there were any difficulties

14

or problems with any of these visits, or that [Shannon] was unable to care for Brooke properly." As noted, the court also concluded that any claims that Shannon was currently abusing drugs were "supported by thin, indirect evidence, and were contradicted by substantial contrary evidence, including direct testimony and the results of numerous drug tests over the past four years." From this finding we conclude the court took seriously the allegations regarding Shannon's drug use, and it was not persuaded that there was a current problem. This was a proper exercise of the court's discretion.

III.

*No Cumulative Error*

Stacie argues the trial court's exclusion of the two arrest reports and the handwriting expert's testimony cumulatively resulted in a miscarriage of justice. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) In light of our conclusion that Stacie has not demonstrated any individual error, the cumulative error doctrine does not apply. (See, e.g., *Jiagbogu v. Mercedes–Benz USA* (2004) 118 Cal.App.4th 1235, 1246 ["Since there is no error in these individual rulings, there is, of course, no cumulative error"].)

Stacie further argues: "After an examination of the entire record, it is clear the trial court would have come to a different and more favorable result if it concluded Shannon falsified drug test results during the period of temporary guardianship, or that Shannon had given drugs to [Robert, and he] had been violent with her while pregnant as recently as 2012."

15

In her reply brief, Stacie reinforces her argument, stating that under Evidence Code section 354, we can find that the trial court would have reevaluated all the evidence differently in light of the excluded arrest records and the handwriting expert's testimony: "Section III (C) of Stacie's Brief sets forth a litany of evidence, that coupled with the forgery, would have led to a different result. The admitted evidence as to detriment under the first prong of section 3104[,] subdivision (a) and evidence as to best interests under the second prong would have been reevaluated in light of Shannon's fraudulent conduct and all of her past conduct, presumed drug use while the guardianship was pending."

Stacie's argument assumes that if the court had found true the matter she was required to prove under the statute, then the court would have granted her petition under the statute. We have no choice but to reject that circular reasoning. Stacie also speculates Judge Longstreth would necessarily have been persuaded by the handwriting expert's testimony, and concluded Shannon had committed forgery. But it is possible Judge Longstreth would have rejected that expert's declaration as Judge Bostwick did.

IV.

*We Deny the Sanctions Request*

Shannon failed to support her request for sanctions with reasoned arguments and citations to legal authority. Her entire contention states: "We are well aware that appellate courts are generally reluctant to impose sanctions based on a frivolous appeal. But we respectfully suggest that sanctions are appropriate in this case as [Shannon] should not have been compelled to respond to an appeal when the trial court's decision is

16

so analytically comprehensive and clear."  Having identified a purported reluctance on the part of appellate courts to issue sanctions, it was incumbent on Shannon to seek to overcome that reluctance by adducing sufficient facts and legal arguments in support of her position.  In light of her appellate brief's cursory argument, we apply the general rule that briefs "should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration."  (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, p. 769.)

DISPOSITION

The order is affirmed.  Shannon P. is awarded costs on appeal.


                                                                    O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.